IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>ROSS NIVEN LEGGE,<br><br>    Defendant. | **MEMORANDUM OPINION AND ORDER**<br><br>Case No. 1:09-CR-00018<br><br>Judge Dee Benson |

This matter is before the court on defendant Ross Niven Legge's motion to suppress (Dkt. No. 35) and amended motion to suppress (Dkt. No. 40). On December 1, 2009, the court conducted an evidentiary hearing on the motions. Mr. Legge was present with his counsel, Ronald Yengich. The government was represented by Robert A. Lund. At the conclusion of the hearing, the court ordered a transcript as well as supplemental briefing from the parties. At Mr. Legge's request, on March 2, 2010, the court heard oral argument on the matter. After review and consideration of the memoranda submitted by the parties, the testimony presented at the evidentiary hearing, and the oral arguments presented by counsel, the court enters the following memorandum opinion and order.

## FACTUAL FINDINGS

The court finds the relevant facts as follows.[1] Trooper Jason Jensen is a 7-year veteran of the Utah Highway Patrol ("UHP"). (Tr. at 5.) As a part-time member of a drug interdiction unit, Trooper Jensen has over 100-hours of specialized training, including training regarding common indicators suggestive of drug trafficking. (Tr. at 5–6.) On February 21, 2009, Trooper Jensen

---

[1]Reference to the transcript of the evidentiary hearing conducted on December 1, 2009, will be cited as "Tr. at __."

was on standard traffic patrol, which included drug interdiction duties on Interstate 15 (I-15) in Box Elder County, Utah. (Tr. at 8, 65.) Trooper Jensen was wearing his standard UHP uniform and drove a marked patrol car. (Tr. at 7.) At approximately 15:49 hours, near milepost 358 on northbound I-15, Trooper Jensen initiated a traffic stop of a black Honda Civic for speeding. (*Id.* at 8.) The Honda pulled to a stop in the right-hand emergency lane. (*Id.* at 9.) Trooper Jensen parked his patrol car behind the Honda with his emergency lights activated. (*Id*. at 10.) Trooper Jensen wrote the driver a ticket for the speeding infraction, and at approximately 15:58 hours, the Honda departed from the traffic stop location. (*Id*. at 10–11.) After the Honda left, Trooper Jensen remained parked at the traffic stop location with his emergency lights activated while he finished processing the ticket. (*Id*. at 11.)

At that location, northbound I-15 consists of two lanes of travel, a left lane and a right lane. (*Id.* at 9.) The emergency lane where the traffic stop took place is adjacent to and right of the right lane of travel. (*Id*. at 11.) As Trooper Jensen prepared to vacate the traffic stop location he observed a black truck traveling toward him in the adjacent right lane of travel. (*Id*.) In addition to the truck, Trooper Jensen observed one vehicle traveling ahead of and one vehicle traveling approximately five seconds behind the truck, both in the left lane of travel. (*Id* at 12.) At approximately 15:59 hours, the truck passed Trooper Jensen's parked patrol car. (*Id*. at 11, 13.) The road conditions at the time were fair. (*Id.* at 13–14.) The weather was clear, the roadway was dry, no pot holes or debris existed on the road, and the conditions provided over a mile of unimpeded visibility prior to reaching the position where Trooper Jensen was parked. (*Id.*) Trooper Jensen assessed that the truck could have safely moved to the left lane because the other vehicles were traveling "far enough ahead" and "far enough back that . . . it was practical for the black pickup truck to move to the left lane." (*Id*. at 12.) Because "vehicles approaching

2

an emergency vehicle with red and blue lights activated are required to slow down and if practical move to the left lane," Trooper Jensen stopped the truck at 15:59:52 hours. (*Id*. at 12–14.) The patrol car's camera recorded the stop. (*Id*. at 14.)

The truck, a black Ford F-150 pickup truck with a shell on the back, bore Minnesota license plates. (*Id.* at 16.) Trooper Jensen did not see the license plate until initiating the stop. (*Id.* at 72–73.) Trooper Jensen approached from the passenger side of the truck and spoke to the occupants, a driver and one passenger. (*Id*. at 16.) The driver was the defendant, Ross Niven Legge, and the passenger was Leonard J. Ferris. (*Id*. at 17.) When the window of the truck was rolled down, Trooper Jensen was immediately overwhelmed with the odor of air freshener and laundry detergent. (*Id*. at 18.) Trooper Jensen observed a variety of Little Tree air fresheners placed around the truck and braided sage across the dash of the truck. (*Id*. at 18–19.) This immediately concerned Trooper Jensen because, based on his experience and training, it is common for drug traffickers to try and mask the odor of drugs using air fresheners. (*Id*. at 19.) When Trooper Jensen asked where they were coming from, Mr. Legge and Mr. Ferris said they were coming from Las Vegas. (Def. Ex. C, Tr. of Traffic Stop ML-09-0049, at 2; Tr. at 19.) Las Vegas is a known major distribution point in the United States for narcotics. (Tr. at 80.)

At the onset of the traffic stop, Mr. Legge asked Trooper Jensen if he was speeding. (Def. Ex. C, at 2; Tr. at 21.) Trooper Jensen informed Mr. Legge he was not speeding and that he was being stopped because of Utah's Slow Down/Move Over Law.[2] (Def. Ex. C, at 2; Tr. at 21.) Mr. Legge produced a Canadian driver's license listing an address in Alberta, Calgary. (Tr. at 17, 19.) Trooper Jensen observed that Mr. Legge's hand was trembling abnormally when he handed Trooper Jensen the driver's license. (*Id*. at 19–20.) Trooper Jensen considered this

---

[2]*See* Utah Code Ann. § 41–6A–904(2).

3

significant because it "showed nervousness from [Mr. Legge], a trait also shown by drug traffickers." (*Id*. at 20.) The passenger identified himself as Leonard J. Ferris. (*Id*. at 17.) Mr. Ferris' driver's license listed an address in Faribalt, Minnesota. (*Id*. at 18.) Trooper Jensen asked for proof of insurance and registration. (Def. Ex. C, at 3; Tr. at 21.) Mr. Ferris indicated that he owned the truck and produced a title to the truck in his name. (Def. Ex. C, at 4; Tr. at 21.) Mr. Ferris also provided proof of insurance. (Def. Ex. C, at 3; Tr. at 21.) However, Mr. Ferris could not initially produce a vehicle registration. (Def. Ex. C, at 4; Tr. at 21.) Trooper Jensen asked Mr. Ferris to look for the registration and hold on to it when he found it. (Def. Ex. C, at 4; Tr. at 21–22.) Trooper Jensen then asked Mr. Legge to accompany him to the patrol car, and Mr. Legge agreed. (Def. Ex. C, at 4; Tr. at 22.)

While running various computer queries and waiting for Mr. Ferris to locate the truck's registration, Trooper Jensen asked Mr. Legge questions about his travel plans and relationship with Mr. Ferris. (Def. Ex. C, at 4–10; Tr. at 22–32, 81.) When Trooper Jensen asked about Alberta's location in relation to Minnesota, Mr. Legge said he currently resided in Spokane, Washington. (Def. Ex. C, at 4; Tr. at 22.) When asked how he knew Mr. Ferris, Mr. Legge said he knew Mr. Ferris through relatives. (Def. Ex. C, at 5; Tr. at 22.) When asked again how he knew Mr. Ferris, Mr. Legge said they knew each other through mutual friends from Moses Lake, Washington. (Def. Ex. C, at 8; Tr. at 27.) When asked specifically about their travel plans, Mr. Legge gave Trooper Jensen three different stories. (Tr. at 26–27.) Mr. Legge informed Trooper Jensen that they were both in Vegas and thought they would take one truck instead of two. (Def. Ex. C, at 5; Tr. at 23.) When asked where they were taking one truck, Mr. Legge said "down to Vegas." (Def. Ex. C, at 5; Tr. at 23.) When asked where he hooked up with Mr. Ferris, Mr. Legge responded that he met Mr. Ferris in Moses Lake and that he drove a newly purchased car

4

to Las Vegas for Mr. Ferris and now they were going back. (Def. Ex. C, at 5; Tr. at 25–26.) Mr. Legge then told Trooper Jensen that he was going to Spokane and then Mr. Ferris was going to Minnesota. (Def. Ex. C, at 6.)

After speaking with Mr. Legge in the patrol car, Trooper Jensen returned to the truck and spoke with Mr. Ferris. (Def. Ex. C, at 10; Tr. at 32.) In the interim, Mr. Ferris located and produced a registration for the truck listing him as the registered owner. (Tr. at 32–33.) When Trooper Jensen asked Mr. Ferris where he and Mr. Legge had met, Mr. Ferris said they had met in Spokane. (Def. Ex. C, at 11; Tr. at 33.) When asked what they did in Las Vegas and if they did anything fun, Mr. Ferris replied "just gambling." (Def. Ex. C, at 12; Tr. at 33.) Mr. Ferris did not mention anything about delivering his car. (Tr. at 33.) When asked where they were going, Mr. Ferris said he was going up to Spokane to pick his nephew and then to Minnesota. (Def. Ex. C, at 12; Tr. at 34.) Trooper Jensen found it unusual that Mr. Ferris was traveling from Las Vegas to Spokane and then to Minnesota. (Tr. at 29–30.)

After speaking to Mr Ferris at the truck, Trooper Jensen returned to the patrol car with the registration. (Tr. at 34.) Trooper Jensen gave Mr. Legge his license and the truck registration and told Mr. Legge "I am just gonna give you a warning." (Def. Ex. C, at 14; Tr. at 34.) Trooper Jensen advised Mr. Legge that "whenever you come up on an emergency vehicle" to "slow down and move over."[3] (Def. Ex. C, at 14.) Mr. Legge apologized to Trooper Jensen and thanked him for the consideration. (Def. Ex. C, at 15; Tr. at 34.) This terminated the traffic stop. (Tr. at 34.) Approximately fifteen minutes elapsed from the time Trooper Jensen initially stopped the truck until he issued the warning and returned Mr. Legge's documents. (Gov't Ex. 1,

---

[3] It appears that Trooper Jensen also discussed with Mr. Legge what to do if there was a car next to him, but his specific instructions are inaudible on the traffic stop recording. (Def. Ex. C, at 14.)

5

Traffic Stop, ML-09-0049.) Mr. Legge opened the door and stepped his right leg out of the patrol car and onto the ground. (Tr. at 34.) Then, due to his suspicions that Mr. Legge and Mr. Ferris were involved in drug trafficking, Trooper Jensen asked Mr. Legge to answer a couple of questions and Mr. Legge agreed without objection. (Def. Ex. C, at 15; Tr. at 35.) Trooper Jensen asked several questions pertaining to whether the truck contained any of various types of contraband. (Def. Ex. C, at 15–16; Tr. at 35.) Mr. Legge answered all the questions, denying that the truck contained any contraband. (Def. Ex. C, at 15–16; Tr. at 35.) Mr. Legge made eye contact with Trooper Jensen through all of the questions except for marijuana and cocaine. (Tr. at 35.)

At this point, Trooper Jensen asked Mr. Legge for consent to search the truck. (Def. Ex. C, at 16; Tr. at 36.) Mr. Legge responded that he could not give consent because the truck did not belong to him but he did not mind if Trooper Jensen searched it. (Def. Ex. C, at 16; Tr. at 36.) Trooper Jensen returned to the truck and asked Mr. Ferris for consent to search the truck. (Def. Ex. C, at 17; Tr. at 36.) Mr. Ferris responded affirmatively that Trooper Jensen could search the truck. (Def. Ex. C, at 17; Tr. at 36–37.) To confirm the consent, Trooper Jensen asked Mr. Ferris a second time for consent and Mr. Ferris replied "you can search, that's fine." (Def. Ex. C, at 18; Tr. at 37.) At the time he granted consent, Mr. Ferris did not appear to be impaired and did not appear to suffer from any mental limitations. (Tr. at 37.)

During the search of the cab of the truck, Trooper Jensen recovered multiple cell phones in the door, a satellite phone on the back seat, braided sage on the back seat, and three atlases on the back seat, one opened to a map of California. (*Id.* at 38–40.) Trooper Jensen also found a car rental agreement dated February 20, 2009 for a car rented by Mr. Legge in Palencia, California. (*Id.* at 39–40.) Similarly, Trooper Jensen found a receipt dated February 20, 2009 for multiple

padlocks purchased in Anaheim, California. (*Id*. at 39.) During the search, Mr. Legge left the immediate area to use the restroom. (*Id*. at 40.)

In a search of the covered bed portion of the truck, Trooper Jensen found four large totes. (*Id*. at 40–41.) Three of the totes were locked with padlocks and one was not. (*Id*. at 41.) Mr. Ferris assisted Trooper Jensen in searching for the keys to the locked totes. (*Id*. at 72.) In one of the totes, Trooper Jensen recovered 23 kilo-sized packages containing cocaine. (*Id*. at 42.) After finding the drugs, Trooper Jensen arrested Mr. Legge and Mr. Ferris and took them to the Box Elder County Jail. (*Id*.) Trooper Jensen obtained a search warrant for the truck and the other totes. (*Id*.) During a subsequent search, Trooper Jensen recovered 60 additional kilograms of cocaine. (*Id*. at 42.) Trooper Jensen discovered a total of 83 kilograms of cocaine in Mr. Ferris' truck. (*Id*. at 43.) Upon inspecting the cocaine, Trooper Jensen observed that the packages of cocaine were coated with laundry detergent. (*Id*. at 77–78.)

## **DISCUSSION**

The Fourth Amendment of the United States Constitution protects citizens from unreasonable searches and seizures by government actors. *See* U.S. Const. Amend. IV; *United States v. Sanchez*, 89 F.3d 715, 717 (10th Cir. 1996). "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." *Wilson v. Arkansas*, 514 U.S. 927, 931 (1995). It is well established that a routine traffic stop and investigative detention, such as the one at issue in this case, is a seizure within the Fourth Amendment. *United States v. Botero-Ospina*, 71 F.3d 783, 786 (10th Cir. 1995), *cert denied*, 518 U.S. 1007 (1996). The reasonableness of such detentions is reviewed under a two-part test set forth in *Terry v. Ohio*, 392 U.S. 1, 20 (1968). Under that test, the court must make a dual inquiry asking first whether the officer's action was justified at its inception and second whether it was reasonably related in

scope to the circumstances which justified the interference in the first place. *See Terry,* 392 U.S. at 20; *United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002).

## A. The Initial Stop

A traffic stopped is justified at its inception if "the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring." *Botero-Ospina*, 71 F.3d at 787. "Our sole inquiry is whether this particular officer had reasonable suspicion that this particular motorist violated 'any one of the multitude of applicable traffic and equipment regulations' of the jurisdiction." *Id.* (quoting *Delaware v. Prouse*, 440 U.S. 648, 661 (1979)).

In this case, Trooper Jensen stopped Mr. Legge's truck because Mr. Legge failed to move into the lane of travel not adjacent to where Trooper Jensen's patrol car was parked with its emergency lights activated. Utah's Slow Down/Move Over Law provides:

> (2) The operator of a vehicle, upon approaching a stationary authorized emergency vehicle that is displaying alternatively flashing red, red and white, or red and blue lights, shall:
>
> (a) reduce the speed of the vehicle;
>
> (b) provide as much space as practical to the stationary authorized emergency vehicle; and
>
> (c) if traveling in a lane adjacent to the stationary authorized emergency vehicle and if practical, with due regard to safety and traffic conditions, make a lane change into a lane not adjacent to the authorized emergency vehicle.

Utah Code Ann. § 41–6A–904(2). At the time Mr. Legge passed Trooper Jensen, only two other vehicles were traveling on the freeway near Mr. Legge, one in front of Mr. Legge and one behind him. Sufficient space existed between the two cars such that Mr. Legge could have safely

8

changed lanes as required by the statute. The road conditions would not have prevented a safe lane change. Hence, the court finds the traffic stop initiated by Trooper Jensen for violation of Utah's Slow Down/Move Over Law was justified at its inception.[4]

**B. The Detention**

Having determined that the stop of Mr. Legge's vehicle was justified at its inception, the court must ask "whether the officer's actions during the detention were reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. The Supreme Court of the United States made it clear that "an investigative detention must be temporary and last no longer than necessary to effectuate the purpose of the stop," and the "scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983). In the course of a routine traffic stop,

> a trooper may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation. Once those tasks are completed, a driver must be allowed to proceed on his way unless reasonable suspicion exists that the driver is engaged in criminal activity or the driver consents to additional questioning.

*United States v. Guerrero-Espinoza*, 462 F.3d 1302, 1307 (10th Cir. 2006) (citing *United States v. Gregoire*, 425 F.3d 872, 879 (10th Cir. 2005)). "[O]nce the purpose of the stop is satisfied and

---

[4]At oral argument, defense counsel argued that the traffic stop was unlawful because Trooper Jensen misunderstood Utah's Slow Down/Move Over Law to be that a driver must always change lanes when approaching a stationary emergency vehicle. Defense counsel relies on a statement made by Trooper Jensen, near the end of the traffic stop, where he said "whenever you come up on emergency vehicle like myself . . . you move over to the left lane." (Def. Ex. C, at 14.) The court finds defense counsel's argument unavailing. Under oath, Trooper Jensen testified that he understood the law to be that "vehicles approaching an emergency vehicle with red and blue lights activated are required to slow down and if practical move over to the left lane." (Tr. at 12.) Accordingly, the court finds that Trooper Jensen understood that a vehicle is only required to move over when practical. *See* Utah Code Ann. § 41–6A–904(2).

9

the underlying reasonable suspicion dispelled, the driver's detention generally must end without undue delay." *United States v. Edgerton*, 438 F.3d 1043, 1047 (10th Cir. 2006).

Mr. Legge argues that Trooper Jensen violated the scope of detention because the detention was not premised on reasonable suspicion of a violation of the law, and because it was extended so Trooper Jensen could develop a reasonable suspicion before giving a verbal warning of the "non-existent" traffic violation. The court disagrees.

1. Initial Detention

The court finds Trooper Jensen's actions during Mr. Legge's initial detention were reasonably related in scope to the traffic stop. An officer may detain a driver and his vehicle as long as reasonably necessary to check necessary information and to issue a citation or warning.[5] *United States v. Wood*, 106 F.3d 942, 945 (10th Cir. 1997). Furthermore, an officer may ask questions unrelated to the reason for the stop, as long as the questioning does not extend the length of detention. *See United States v. Valenzuela*, 494 F.3d 886, 888 (10th Cir. 2007); *United States v. Alcaraz-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006). In the instant case, Trooper Jensen detained Mr. Legge only long enough to obtain necessary information and issue the warning citation. The questioning did not extend the length of detention. The whole encounter, from the moment of the traffic stop until the point of release, lasted less than 15 minutes. During the time that Trooper Jensen questioned Mr. Legge and Mr. Ferris about their travel plans and relationship, Mr. Ferris searched for and produced the vehicle registration; and Trooper Jensen

---

[5]Defense counsel argues that the scope of detention was unlawful because "[a]s a matter of Utah law, there is no authority for police to give motorists verbal or even written warnings." (Def. Mem. in Supp. of Mot. to Suppress, at 11.) The court rejects this argument because the United States Supreme Court, the Court of Appeals for the Tenth Circuit, and the Supreme Court of Utah have all recognized that issuing a warning citation is within the proper scope of a traffic investigation. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005); *Guerrero-Espinoza*, 462 F.3d at 1307; *State v. Hansen*, 63 P.2d 650, 661–62 (Utah 2002).

verified necessary information, performed computer checks, and completed the warning citation. Therefore, the court finds that Trooper Jensen's detention of Mr. Legge lasted no longer than necessary to effectuate the purpose of the traffic stop.

2. <u>Extended Detention</u>

Additionally, the court finds that Mr. Legge was legally detained beyond the initial scope of the traffic stop because Trooper Jensen had both reasonable suspicion of criminal activity and valid consent to continue the conversation. Reasonable suspicion or consent allows an officer to legally extend a traffic stop beyond its initial scope. *See United States v. Villa-Chaparro*, 115 F.3d 797, 801 (10th Cir. 1997).

*a. Reasonable Suspicion*

Trooper Jensen developed reasonable suspicion during the initial traffic stop and continuing throughout the encounter sufficient to extend his detention of Mr. Legge. Reasonable suspicion requires only a particularized and objective basis for suspecting criminal activity. *United States v. Trujillo*, 404 F.3d 1238, 1244 (10th Cir. 2005). To determine whether reasonable suspicion exists, the court looks to the "totality of the circumstances." *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). In this case, a number of facts observed during the encounter triggered Trooper Jensen's suspicion of drug trafficking: (1) the fact that Mr. Legge and Mr. Ferris were traveling from a known drug source city; (2) the odor masking items including the overwhelming smell of laundry detergent, the presence of multiple air fresheners, and braided sage on the dashboard; and (3) Mr. Legge's unusual nervousness. Each of these factors, taken alone, might not provide Trooper Jensen with reasonable suspicion of criminal activity. But together, they suggest suspicious circumstances that justified Trooper Jensen investigating further. *See United States v. White*, 584 F.3d 935, 951–52 (10th Cir. 2009) (noting

11

that combined with other factors, travel from a known drug source city can contribute to a reasonable suspicion of illegal activity); *United States v. Villa-Chaparro*, 115 F.3d 797, 802 (10th Cir.), *cert. denied*, 522 U.S. 926 (1997) (holding that odor masking items coupled with other indicia of criminal activity support a reasonable suspicion); *United States v. Ledesma-Dominguez*, 53 F.3d 1159, 1161 (10th Cir. 1995) (finding reasonable suspicion based on the defendant's nervousness, presence of odor masking items, and absence of personal identification).

Even though Trooper Jensen had sufficient reason to extend the detention at that point, additional facts unfolded that contributed to the reasonable suspicion calculus. In particular, he discovered (1) Mr. Ferris' unusual travel plans from Las Vegas to Spokane to Minnesota, and (2) inconsistencies in information provided by Mr. Legge and Mr. Ferris including how they knew each other, where their trip started, where they were going, how many vehicles they traveled in, and their purpose for going to Las Vegas. *See United States v. Villa*, 589 F.3d 1334, 1341 (10th Cir. 2009) (unusual travel plans combined with unusual nervousness can contribute to reasonable suspicion); *Wood*, 106 F.3d at 947 (explaining "inconsistencies in information provided to officer during [a] traffic stop may give rise to reasonable suspicion of criminal activity"). Throughout the entire encounter, Trooper Jensen was presented with more and more evidence to create a reasonable suspicion, and justify a brief additional detention to allow Trooper Jensen to attempt to confirm or dispel his suspicions. *See Hiibel v. Sixth Judicial Dist. Court*, 542 U.S. 177, 185 (2004) ("a law enforcement officer's reasonable suspicion that a person may be involved in criminal activity permits the officer . . . to take additional steps to investigate further"). Thus, the court finds that Trooper Jensen had reasonable suspicion of illegal drug trafficking sufficient to extend the scope of Mr. Legge's detention.

### b. Voluntary Consent to Further Questioning

Moreover, Mr. Legge consented to further questioning. Whether a driver has consented to additional questions and detention turns on whether "a reasonable person would believe he was free to leave or disregard the officer's request for information. *United States v. Manjarrez*, 348 F.3d 881, 885 (10th Cir. 2003). Here, valid consent was obtained after Trooper Jensen issued Mr. Legge a warning, returned Mr. Legge' documentation, and Mr. Legge thanked Trooper Jensen for his consideration. As confirmed by the recording of the encounter, these actions and words indicated to Mr. Legge that he was free to leave, and Mr. Legge indeed opened the door and stepped his right leg out of the patrol car and onto the ground. It was only then that Trooper Jensen asked Mr. Legge if he would answer more questions. Trooper Jensen was the only officer present and he did not coerce or cajole Mr. Legge in any way. Accordingly, the court finds that Mr. Legge voluntarily consented to the extended encounter with Trooper Jensen.[6]

In sum, the court finds that Mr. Legge was lawfully detained.

## C. Search of the Truck

Having determined that the detention was lawful, the remaining issue concerns the search of the truck. Mr. Legge argues the search of the truck was illegal because the detention was illegal and the consent was involuntary.

Absent a possessory or property interest in the vehicle searched, a passenger or non-owner driver lacks standing to challenge vehicle searches. *United States v. Eylicio-Montoya*, 70 F.3d 1158, 1162 (10th Cir. 1995). Further, when the owner of a vehicle is present, a non-owner driver of the vehicle has no standing to challenge the constitutionality of a search of the vehicle.

---

[6]During this encounter, Mr. Ferris consented to the search of his truck, and Mr. Legge advised Trooper Jensen that he also did not mind if Trooper Jensen searched the truck.

13

*United States v. Jefferson*, 925 F.2d 1242, 1250 (10th Cir. 1991). A defendant who is a non-owner in a vehicle may nonetheless contest the lawfulness of his own detention and seek to suppress evidence found in the vehicle as the fruit of an illegal detention. *See United States v. Ladeaux*, 454 F.3d 1107, 1111 (10th Cir. 2006). To successfully suppress evidence as the fruit of an unlawful detention, a defendant must first establish that the detention violated his Fourth Amendment rights. *Id.* The defendant then bears the burden of demonstrating a factual nexus between the illegality and the challenged evidence. *Id.* In order for a defendant to meet his burden of showing a "factual nexus" he must show that the evidence never would have been found but for his, and only his, unlawful detention. *Id.*

In the instant case, Mr. Ferris, the owner of the truck, was present and Mr. Legge did not have and has not asserted any ownership or possessory interest in the truck. Therefore, Mr. Legge lacks standing to directly challenge the search of the truck. Furthermore, because Mr. Legge was lawfully detained, the search of the truck cannot be the "fruit" of an illegal detention. Accordingly, the court denies Mr. Legge's claim that evidence in this case should be suppressed as the fruit of an unlawful search and/or illegal detention.

## CONCLUSION

For the reasons discussed above, it is hereby ordered that the defendant's motion to suppress and amended motion to suppress are DENIED.

Dated this 15th day of March, 2010.

                                                                                   _____
                                                                                   Dee Benson
                                                                                   United States District Judge